# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RAMONA COLON,** | : | |
| **934 Ferry Street, Apt. 1** | : | **CIVIL ACTION** |
| **Easton, PA 18042,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **No.** |
| **vs.** | : | |
| | : | |
| **OFFICER AARON EUGENE KINNEL,** | : | |
| *Individually and in his official capacity as a* | : | |
| *member of the Easton Police Department* | : | |
| **48 N. 4th Street** | : | |
| **Easton, PA 18042,** | : | |
| | : | |
| **SERGEANT RYAN CELIA,** | : | |
| *Individually and in his official capacity as a* | : | |
| *member of the Easton Police Department* | : | |
| **48 N. 4th Street** | : | |
| **Easton, PA 18042,** | : | |
| | : | |
| **JOHN/JANE DOES 1-X,** | : | |
| *Individually and in their official capacities as* | : | |
| *members of the Easton Police Department* | : | |
| **48 N. 4th Street** | : | |
| **Easton, PA 18042,** | : | |
| | : | |
| **CHIEF CARL SCALZO,** | : | |
| *Individually and in his official capacity as the* | : | |
| *Chief of the Easton Police Department* | : | |
| **48 N. 4th Street** | : | **Jury Trial Demanded** |
| **Easton, PA 18042,** | : | |

1

**MAYOR SALVATORE J. PANTO, JR.,**    :
*Individually and in his official capacity as*    :
*Mayor of the City of Easton*    :
**Easton City Hall**    :
**123 South Third Street**    :
**Easton, PA 18042,**    :
     :
**CITY ADMINISTRATOR LUIS CAMPOS,**    :
*Individually and in his official capacity as*    :
*City Administrator of the City of Easton*    :
**Easton City Hall**    :
**123 South Third Street**    :
**Easton, PA 18042,**    :
     :
    **and**    :
     :
**CITY OF EASTON,**    :
**Easton City Hall**    :
**123 South Third Street**    :
**Easton, PA 18042,**    :
     :
       **Defendants.**    :

## COMPLAINT

    **NOW COMES**, the Plaintiff, **RAMONA COLON**, by and through her legal

counsel, Robert E. Goldman, Esquire, and does hereby allege and aver the following:

## I.   JURISDICTION AND VENUE

   1.    This action is instituted under the United States Constitution, particularly

       under the provisions of the Fourth and Fourteenth Amendments, and under

       federal law, particularly the Civil Rights Act of 1871 (hereinafter referred

       to as the "Act"), <u>as amended</u>, 42 U.S.C. §§ 1981, 1983, 1985, 1986 and

       1988.

2.     This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331, § 1343(a)(3), § 1343(a)(4) and § 1367(a), regarding the principles of pendent and supplemental jurisdiction over related state law claims.

3.     Venue in the Eastern District of Pennsylvania is properly laid pursuant to 28 U.S.C. § 1391, insofar as the alleged unlawful conduct complained of in this Complaint, which forms the factual and legal basis of the Plaintiff's claims, arose within the geographical limits of this District in general and within the geographical limits of the City of Easton, Pennsylvania, in particular.

## II.    <u>PARTIES</u>

4.     Plaintiff Ramona Colon (hereinafter "Colon" or "Plaintiff") is an adult individual, who has a home address of 934 Ferry Street, Apt. 1, Easton, Northampton County, Pennsylvania, 18042.

5.     Defendant Officer Aaron Eugene Kinnel (hereinafter referred to as "Kinnel") is an adult individual who, at all times relevant hereto, was serving in his capacity as a sworn officer of the Easton Police Department, and was entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Easton. Defendant Kinnel was entrusted to protect the Constitutional rights of those he encountered, and at all times relevant hereto, was acting under the

authority and color of law, and in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

6.     Defendant Sergeant Ryan Celia (hereinafter referred to as "Celia") is an adult individual who, at all times relevant hereto, was serving in his capacity as a sworn officer of the Easton Police Department, and was entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Easton.  Defendant Celia was entrusted to protect the Constitutional rights of those he encountered, and at all times relevant hereto, was acting under the authority and color of law, and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

7.     Defendant(s) John/Jane Does 1-X (hereinafter referred to as "Doe") are adult individual(s) who, at all times relevant hereto, was/were serving in his/her/their capacity as a sworn officer(s) of the Easton Police Department, and was/were entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Easton. Defendant(s) Doe was/were entrusted to protect the Constitutional rights of those he/she/they encountered, and at all times relevant hereto,

4

was/were acting under the authority and color of law, and in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

8.     Defendant Officers John and Jane Doe are believed to be sworn members of the Easton Police Department who participated in the home invasion, conspiratorial acts and related matters as described herein, whose present identity is unknown but, who have the same duties and responsibilities as the described police officer Defendants above and, where identity is anticipated to be disclosed during the federally mandated discovery process in this case.

9.     Defendant Police Chief Carl Scalzo (hereinafter referred to hereinafter as "Chief" or "Chief Scalzo" or "Scalzo") is an adult individual who, at all times relevant hereto, was a sworn member of the Easton Police Department with the rank of Chief who together with the Defendant City of Easton, its Mayor and its Administrator, was responsible for the formulation and/or implementation of practices, policies, and procedures, discipline and assignment of officers, hiring and firing, as well as the day to day operation and overseeing and command and control of all segments of the Police Department, and who at all times relevant hereto was acting within the scope of his duties and authority, under color or title of state or

municipal public law or ordinance and supervised or controlled one or more of the other Defendants herein in their conduct or actions, or acted in concert with them in the performance of their conduct or actions, or acted independently.  It is believed, and therefore averred, that Defendant Scalzo, along with Defendants Panto and City of Easton, at all pertinent times, were the ultimate authorities for the staffing, promotions, discipline and/or operational functions of the Easton Police Department, with the final and unreviewable decision-making authority of policymakers.  The Chief is in direct command of the police force ("hereinafter referred to as "police department" or "department") and, subject to the approval of the Mayor, makes rules and regulations concerning the operation and management of the Easton Police Department.

10.   Defendant Mayor Salvatore J. Panto, Jr., (hereinafter referred to as "Mayor Panto") is an adult individual who is and was at all times pertinent, the duly elected Mayor of the City of Easton with direct control over the City's full service Police Department ("Department"), who exercises the sole authority and responsibility to appoint the head of the Police Department, and did so by appointing Chief of Police, Defendant Carl Scalzo.  The Mayor is a decision-maker with final unreviewable discretion with regard to the operation of the Easton City Police Department.

11.     Defendant Luis Campos is the City Administrator for the City of Easton whose duties, at all times pertinent, included the supervision of the City of Easton Police Department.

12.     Defendant City of Easton (hereinafter referred to as "Easton" or the "City") is a governmental entity within the Commonwealth of Pennsylvania, with its administrative offices located at 123 South Third Street, Easton, PA 18042.   It is empowered to establish, regulate, and control its Police Department for the enforcement of laws and ordinances within its jurisdiction, and for the purpose of protecting and preserving the persons, property and the Constitutional rights of individuals within the geographical and legal jurisdiction of Defendant City of Easton.

13.     Defendant City of Easton is also a Third Class City governed by a Mayor-in-Council form of government.

## III.     PRE-DISCOVERY FACTUAL ALLEGATIONS

14.     On Saturday, July 27, 2019, 71 year old grandmother, Ramona Colon, Plaintiff herein, together with her family, friends and neighbors, was enjoying a block wide Bar-B-Q cook out and party on the 900 Block of Ferry Street, Easton, Pennsylvania, where she lived.

15. Most of the block had grills, tables and/or food in front of their homes, as did Plaintiff's, whose home was located approximately one third of the way into the block, at 934 Ferry Street.

16. Throughout the block, people were conversing and enjoying themselves, music was playing from dozens of sources, including cars, portable speakers, hand-held devices, and even from the homes themselves.

17. The closest source of music to the Plaintiff's home was a car (not hers) parked in front of it on Ferry Street and, at no time did its general loudness exceed that of the ambient street music coming from other sources.

18. The Plaintiff and her family are of Puerto Rican/Hispanic decent and the surrounding homes in this residential area, and the families enjoying this summer activity, included other ethnicities, including Caucasians.

19. At approximately 7:10 p.m. on said day, Officer Jonathan Vidal was dispatched to the area of the 900 Block of Ferry Street based upon an anonymous noise complaint.

20. Officer Vidal appeared at 934 Ferry Street, the home of the Plaintiff and other persons, and requested those in the vicinity to lower the volume of the music coming from a vehicle parked in front of the residence.

21.   Although Defendant Vidal had passed by the residence four or five times throughout his patrol that day, he had not told anyone, during those times, that the music was too loud or, to turn the volume down.

22.   Notwithstanding the foregoing, an unknown individual entered the vehicle, as directed byVidal, and turned the music down to Vidal's satisfaction and, the noise complaint concerning loud music, which brought Officer Vidal to the area, was then and there resolved.

23.   However, "back-up" patrolman, Defendant Aaron Eugene Kinnel then arrived on the scene.  And, as soon as he identified the Plaintiff's son, with whom he had a prior history, Defendant Kinnel radioed for "back up" to come to the son's address.

24.   Defendant Kinnel, who had previously falsely accused Plaintiff's son of disorderly conduct and who had filed spurious criminal charges which were thereafter dismissed by the court, had clear enmity towards him, engaged the son (who was at the Bar-B-Q) in particular, and the Hispanic neighbors consequently in general, in taunting language, which included racially charged language such as referring to the son and his family and friends as "you people."

25.   Some unidentified person in the crowd called Kinnel a "racist" and Kinnel scoffed, saying that he doesn't "like people who break the law."  The son

replied that he had beat Kinnel in court before and would beat him again on this (i.e. the filing of a noise complaint against the son as a pretext to harass the Hispanic people who were gathered).

26.   The clear racial animus that was fueling the conduct of the Defendants at the time of the incident was apparent from their comments directed at the minority crowd, of which the Plaintiff was a part. These include declarations identical to or, in pertinent part, substantially similar to the following:

a.   "You people can't do this in this country."

b.   "Go back to where you came from if you want to live like this."

c.   "You people haven't seen the last of us."

d.   Why can't you live like the rest of us."

e.   We're coming for you, again and again."

f.   We'll show you people whose boss."

27.   These racially charged statements were made by individual Defendants and, were not corrected, or checked by any Easton Police officer who was present and surrounding the Plaintiff's home, and they were clearly in a position to hear them and appreciate both their racial and antagonistic nature but failed to intervene in any way to curtail same.

28.   Emboldened by the police presence he had summoned, Defendant Kinnel then told Defendant Sergeant Celia that he was going to cite the Plaintiff's son via mail for disorderly conduct because he was the root of the problem and responsible for the loud music.

29.   In Fact, there was no loud music associated with the son and, more importantly, the music that had been coming from the vehicle in front of 934 Ferry Street had already been lowered, at Officer Vidal's direction, to a volume acceptable to him.

30.   There was however music being played more loudly in front of, or at, several other residences along the block but, no one there was spoken to about it, much less did any citations issue to any of those people, nor were any of those residences menacingly surrounded by police officers requested to respond specifically to 934 Ferry Street where Plaintiff's son resided and where Kinnel immediately went after.

31.   Instead, Defendant Kinnel directed a verbal attack upon the son and began to agitate him.  In response, the son said words to the affect that I beat you in court and I'll beat you on this, which enraged Kinnel even more.

32.   Kinnel told the son to "get the f***" inside" and the son reluctantly complied by climbing the porch steps and stepping into the house. As he passed the Plaintiff who was in the vestibule, he said to her in Spanish,

"Look, it's the same guy listen to him. Now he's making me be a prisoner in my own house."  To which the Plaintiff said in Spanish, "Forget him. God has a long memory for such things."

33.  The Plaintiff was unaware that Defendant Kinnel, of whom her son was just speaking to, was then in an enraged state, charging violently through the crowd, grabbing (including in a sexually offensive way), pushing, assaulting, and throwing aside people indiscriminately with the goal of getting to her son.

34.  Then, just as she had finished her words to her son and with her back still toward the threshold to the police, Defendant Kinnel, in a fit of growing rage, violently did, without warning, grab the Plaintiff from behind, pulled her from the vestibule of her home and slammed her on the cement floor of the porch outside and below the threshold.

35.  The Plaintiff screamed in pain and, in response, Defendant Kinnel stomped with his foot on her ankle to keep her pinned to the ground; causing even more pain.   And, when Kinnel thought that this did not constitute a sufficient infliction of pain, he Tased the Plaintiff in her chest with a probe of what was believed to be his X2 Taser, piercing her skin and entering her body and then electrifying her with 1,400 volts at 3.5 Amperes, of one or more surges.

36.     The Plaintiff convulsed in pain, screamed, went limp and lost consciousness for a brief period of time.

37.     Not only did none of the other Defendants attempt to prevent Defendant Kinnel from committing his warrantless entry into the home and, not only did none of the other Defendants prevent Defendant Kinnel's vicious assault upon the Plaintiff, but not a single one provided her with any aid or comfort, leaving her lie there with a prong and wires protruding from her chest, near her heart.

38.     Defendant Kinnel also tasered the son inside the residence who was merely coming to the Plaintiff's aid after she was viciously thrown onto the concrete porch and on whose leg and ankle Defendant Kinnel intentionally continued to stand on with his full weight.

39.     Defendant Kinnel had to be removed from on top of the injured and elderly Plaintiff by bystanders while other Defendants rushed the porch to assist Kinnel – not the seriously injured Plaintiff who had sustained the aforesaid unconscionable and criminal assaults.

40.     The Plaintiff went limp and lost consciousness for a brief period of time until she was revived by family members who threw cold water on her face.

41.   After a significant delay and misdirection caused by police communications, the Plaintiff was taken to the hospital by ambulance, and to add insult to injury, the Defendants refused to allow a family member to accompany the distraught and crying Plaintiff in the ambulance to supply comfort to the distraught Plaintiff.

42.   As a direct and proximate result of the aforesaid acts and omissions of the said Defendants, and the conduct of the City and its policymakers identified hereinafter, without which and whom none of said conduct or harms would likely have occurred, the Plaintiff suffered, and may continue to suffer into the indeterminate future, the following harms, losses, injuries and damages:

   i.   physical and mental pain and suffering, in both the past and the predictable future, including discomfort, loss of use of bodily function, including the ability to ambulate, ill health, loss of sleep, and other emotional injuries including stigma, defamation, humiliation, distress, fright, PTSD and other emotional trauma;

   ii.   medical and psychological expenses, past and future;

   iii.   loss of life's pleasures;

   iv.   general damages for violation of Plaintiff's Constitutional rights under the Fourth and Fourteenth Amendments to the United

States Constitution and Article 1, Section 8 of the Pennsylvania

Constitution; and

v. punitive damages (except as to the City of Easton and the

Defendants in their official capacities), which are justified

factually as alleged herein, and legally, because the Defendants

acted maliciously, recklessly and/or wantonly in violating the

Plaintiff's Constitutionally (federal and state) protected rights,

and because they intentionally, recklessly and willfully engaged

in reprehensible and outrageous conduct not to be tolerated in a

civilized society.

43. The force employed by the Defendant Kinnel in the course of invading the

Plaintiff's residence by savagely grabbing her and throwing her viciously

onto a cement porch below and by brutally Tasering her and stomping on

her ankle, was unreasonable and excessive, and totally unwarranted and

unnecessary, and caused serious physical and/or emotional pain and

suffering, and permanent damage to the Plaintiff, as more fully set forth

herein.

44. The Plaintiff did not constitute any threaten or provide any resistance to

the Defendants when the Defendants decided to violently invade the

residence and brutalize her as stated above.

45.   The Defendants filed numerous false police reports (or filed no report) to cover-up the Defendants' unlawful and unconstitutional conduct, and they manufactured inculpatory facts, and omitted true material facts, in doing so.

46.   Defendant Officers had the duty as sworn Easton police officers to report the true nature of the unwarranted assault upon the Plaintiff and her premises, but did not do so in order to cover-up the illegal conduct and to pervert the judicial process.

47.   Due to the events of that night, the Plaintiff suffered physical injuries and psychological damages which required and/or will require treatment, and which will and/or should continue into the future.

48.   It is believed that one or more of the Defendant Officers including most especially Defendants Kinnel and Celia, have a history of violence and Constitutional violations that were known to their supervisors, policy-makers, and Defendant City of Easton and the Hispanic Community as a whole.   This history has gone undisciplined and, in essence, the Defendants' past actions were condoned and encouraged by their supervisors and the City of Easton, leading to the Constitutional violations complained of in this action.

16

49.   No discipline of any kind was imposed upon the Defendants, nor any other of the City of Easton personnel that assisted in covering up their clearly unconstitutional conduct.

50.   Equally telling is the fact that, of the numerous investigations which were supposedly conducted into Officers' misconduct over the last several years, it is believed and therefore averred, that <u>none</u>, were determined to be founded, when some, at least, clearly warranted dismissal or, disciplinary action and/or retraining, and no dismissals, disciplinary action or retraining resulted.

51.   No appropriate independent investigation was undertaken, no discipline was issued, and no retraining was ordered, by the City of Easton, its Defendant Mayor, or its Defendant Administrator, the Defendant Chief of Police, or any Defendant supervisor regarding the clear Constitutional violations committed by the Defendant Officers against Plaintiff.

52.   This lack of appropriate investigation and discipline was a long-standing practice and custom of the City of Easton and further evidences that supervisors and decision-makers, were not only deliberately indifferent, but that violations of citizens' Constitutional rights were condoned, if not encouraged, by supervisors and decision-makers of the City of Easton, and became a custom or *de facto* policy within its Police Department.

53.   Defendants, the City of Easton, the Easton Police Department, its Mayor, its Chief of Police and its Administrator provided inadequate training to Defendant Officers pertaining to crowd control, de-escalation, minority rights, the appropriate use of force to employ in given circumstances, prohibitions against illegal entries, unlawful searches and seizures, and concerning when and how to use a Taser, and when to intervene to stop unlawful use of force by a fellow officer, like that which the Defendants encountered on the day in question; and, no appropriate remedial training for these Defendants was demanded or provided.

54.   Historically, members of the Easton Police Department routinely used excessive force in the performance of their duties, and no known disciplinary action was taken in any of those instances.

55.   Prior to the incident giving rise to Plaintiff's Complaint, the written policies that existed regarding group encounters and constitutional limitations, the appropriate use of force to be utilized in circumstances akin to those encountered here and commonly encountered by law enforcement, were severely deficient and, even then, were routinely ignored, and this abuse was accepted as the common practice and custom within the Department.

56.    Despite repeated incidents and/or complaints of excessive use of force committed by City of Easton Police Officers, including specifically the named Defendants here, no significant efforts were made to establish or ensure actual proper use of force standards were adhered to within the Police Department, and no efforts were made to ensure citizens' Constitutional rights were not violated.

57.    This custom and *de facto* policy supported an ongoing culture within the Easton Police Department which not only condoned, but encouraged, the sort of Constitutional violations which occurred here, with each Defendant knowing that his conduct would go unpunished and undeterred.

58.    The aforesaid acts and omissions of the Defendants, or one or more of them, evidence a deliberate indifference to the rights guaranteed to individuals, such as the Plaintiff, under the Fourth and Fourteenth Amendments to the United States Constitution.

59.    At all times relevant hereto, the legal principles regarding the rights of persons, such as the Plaintiff, to be free from the excessive use of force by a police officer, to be free from unlawful seizure, to be free from unlawful search, and to be accorded the due process of law, as well as the contours of those Constitutional and statutory rights, were well established, and it

was not reasonable for the Defendants to believe that their actions would not deprive the Plaintiff of those rights.

60. The actions of the Defendants violated the clearly established and well-settled federal Constitutional rights of the Plaintiff as more clearly set forth in the Counts below.

61. The Plaintiff did not physically resist, threaten, or assault the Defendants in any way, and the force used against the Plaintiff was totally and completely unnecessary, unreasonable, excessive and outrageous, warranting the award of both compensatory damages, as well as punitive damages against the Defendant Officers in their individual capacities.

62. At no time during the events described above was the Plaintiff a threat to others. To the contrary, she was peacefully and lawfully abiding within her home, and was fully within her right to do so.

63. The City of Easton, acting through its policy makers, routinely ignored citizens' complaints of officers' violations of citizens' Constitutional rights, and/or ignored their duty to question, review and monitor such things. In effect, it was communicated to the Department, and the public, that any attempt to reform the Department would be ineffectual and that the custom and practice of inflicting Constitutional abuses by members of

the Easton Police Department would remain intact, thanks to the inaction and deliberate indifference of their supervisors and policymakers.

64.    The City of Easton Police Department's citizen complaint protocol intentionally and systematically, cleansed and under-reported police abuse complaints by the citizenry, even as it institutionally deterred them from being made, and even as it ignored them when made.

65.    In effect, the Easton Police Department and the City of Easton, acting through its policy-makers and supervisors, have institutionalized a policy to cover-up police wrongdoing, including precisely of the nature evidenced here, or at the very least turned a blind eye to the wrongdoing and any issue as to whether it occurred, sending a message to both the Department and the public at large, that Constitutional violations will not only go unpunished but will be tolerated, if not encouraged by the City of Easton and its police administration.

66.    The supervisors, and decision-makers within the City and Police Department, could not properly access, monitor, assess and correct the Department's culture and custom of the use of excessive force because the information necessary to do so was purposefully not readily available to them; and, they did nothing to make it readily available in a system which

ignored the difficulty required to retrieve that essential information, and on a system which failed to establish reasonable accountability.

67.   This constitutes deliberate indifference *per se* and a complete abdication of supervisory and decision-making responsibility.

68.   The Mayor, Administrator, City, and the police chief, among other decision-makers and supervisors, failed to adopt and enforce reasonable and necessary policies and procedures to end the culture of abuse and of deliberate indifference to the rights and safety of citizens that had become the long-standing hallmark of the Easton Police Department.   The said Defendants, continued to encourage this custom and practice of deliberate indifference to the Constitutional rights of others by ignoring and even rewarding inappropriate actions; by failing to promulgate appropriate rules, regulations and policies; by failing to enforce existing rules and regulations; by failing to discipline; by inappropriate hiring, training, drug testing, supervision and promotional practices; and by reinforcing the old culture of deliberate indifference.

69.   At all times during the events described above, the Defendant Officers were engaged in a joint venture.   These individual Defendants assisted each other in performing the various actions described, and lent their

physical presence, support, intimidation and the authority of their office to each other during the said events.

70. As a direct and proximate result of the said acts or omissions of the Defendant Officers, made possible by and compounded by the stated actions or inactions of the other *Monell* Defendants, the Plaintiff suffered, *inter alia*, one or more of the injuries and damages, described *infra.*

71. Plaintiff further seeks counsel fees and costs as authorized by statute.

72. The actions of the Defendants violated the clearly established and well-settled federal Constitutional rights of the Plaintiff and, it would be unreasonable for any Defendant to believe that they were not violating such rights as more clearly set forth in the Counts below.

73. Plaintiff believes, and thus avers, that without the intervention of this Honorable Court, Plaintiff in particular, as well as others, is likely to suffer damages from repeated similar Constitutional violations in the future, requiring injunctive relief.

74. The Defendants, individually and collectively, at all times pertinent to the claims asserted herein, acted under color of state law.

75. While acting under color of state law, the Defendants deprived the Plaintiff of various state and federal Constitutional rights as more fully set forth herein.

## COUNT I
**42 U.S.C. § 1983**
**Excessive Force**
*Against Defendant Kinnel*

76. The preceding paragraphs are incorporated herein by reference as though fully set forth.

77. The Plaintiff was subjected to a seizure within the meaning of the Fourth Amendment through the application of force.

78. The application of force against the Plaintiff was unreasonable under the circumstances and unconstitutionally excessive.

79. The Fourth Amendment to the United States Constitution protects persons from being subjected to excessive force.

80. Defendant Kinnel used excessive force in his assault upon the Plaintiff in that there was absolutely no need for the application of any force, and in view of the fact that the amount of force actually used by the Defendant exceeded the amount of force which a reasonable officer would have used under similar circumstances, and force of a kind which violated the Easton Police Department's own policies, deficient as they may otherwise be.

81. Accordingly, no physical force of any kind, was required or should have been employed against Plaintiff here.

82. The Plaintiff was peacefully occupying her own home and/or premises when she was brutally assaulted by the Defendant.

83. The Plaintiff did not present any threat to the Defendants nor any other persons or property at the time she was assaulted.

84. Defendant Kinnel used excessive force in his encounter with the Plaintiff when he viciously assaulted her as stated hereinbefore.

85. The use of force was not reasonable under the Constitution where, as here, there was no need for any force, especially the force that was used.

86. The nature and degree of excessiveness utilized against the Plaintiff by the Defendant was outrageous, reprehensible, malicious, vicious, intentional, and malevolent, and clearly warrants an award of punitive and compensatory damages.

87. As a result of the excessive use of force employed against the Plaintiff in violation of her Fourth Amendment rights, the Plaintiff suffered damages as stated hereinbefore.

88. Defendant Officer Kinnel is liable for his personal involvement in the commission of the acts complained of here.

89. Defendant, the City of Easton, and its policy-making and supervisory employees are liable for the acts of all Defendants pursuant to the claims of Municipal Liability (*Monell*), expressly set forth herein, and which are incorporated by reference as if set forth *et extenso* here.

90. Further, the conduct exhibited by subordinate municipal officers and employees, which occurred on July 27, 2019, was not unexpected. Neither were they the deeds of independent, non-supervisory actors. But, rather, they constituted predictable behaviors of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, and their joint policies, practices and customs, which operated as the moving force behind what the Officers believed to be their unaccountable efforts to engage in what had become, all too customary, Constitutional deprivations.

91. The likelihood is that, but for the alleged acts and omissions committed by the other Defendants, the injuries inflicted upon the Plaintiff would not have occurred.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against Defendant Kinnel, jointly and severally with the City of Easton, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendant Kinnel in his individual capacity and, such other relief, including injunctive relief, which the Court may find appropriate.

## COUNT II
### 42 U.S.C. §1983
### Unlawful Search in Violation of Fourth Amendment
### *Against Individual Defendant Kinnel and Does*

92. The preceding paragraphs are incorporated herein by reference as though fully set forth.

93. Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment.

94. Warrantless searches are presumptively unreasonable under the Fourth Amendment.

95. The above named Defendants, violated Plaintiff's Fourth Amendment rights actionable under 42 U.S.C. § 1983 by causing, assisting, aiding and abetting, and conducting a warrantless intrusion into, and search of, Plaintiff's home on July 27, 2019.

96. The above named Defendant Kinnel physically restrained Plaintiff and brutally threw her from her residence and onto the outside cement porch, in order to facilitate his warrantless and unlawful entry.

97. It is believed, and therefore averred, that in addition to Defendant Kinnel, other Defendants also unlawfully entered the Plaintiff's home.

98. It is believed, and therefore averred, that John/Jane Doe Defendants may also have unlawfully entered the Plaintiff's property, and their identities will be borne out through discovery in this matter.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the named Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacity and, such other relief, including injunctive relief, which the Court may find appropriate.

## COUNT III
### 42 U.S.C. § 1983
### Unlawful Seizure
### *Against Defendant Kinnel*

99.     The preceding paragraphs are incorporated herein by reference as though fully set forth.

100.    The conduct of Defendant Kinnel constituted an unlawful arrest and seizure of the Plaintiff, within the meaning of the Fourth Amendment, in that she experienced, *inter alia*, an unreasonable deprivation of her freedom of movement by virtue of the unlawful seizure of her person and assault upon her.

101.    Said seizure was unreasonable and without probable cause in that the facts and circumstances available to the Defendants would not warrant a prudent officer in believing that the Plaintiff had committed or was committing a crime, which would justify her seizure.

102.   The Plaintiff was subjected to unlawful seizure in violation of the Fourth Amendment of the United States Constitution.

103.   As a result of the unlawful seizure affected upon the Plaintiff, the Plaintiff suffered damages as stated herein.

104.   Defendant Kinnel is personally liable for his direct involvement in the commission of the acts complained of here.

105.   The City of Easton and police supervisors are liable for the acts of all Defendants pursuant to the claims and theories expressly set forth hereinafter, and which are incorporated by reference as if set forth *et extenso* here.

106.   Further, the conduct exhibited by the subordinate officers, which occurred on or about July 27, 2019, and thereafter, were not unexpected.  Neither were they the deeds of independent, non-supervisory actors.  But, rather, they constituted predictable behavior of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, and the joint policies, practices and customs, of the City which operated as the moving force behind what the Defendant Officers believed to be their unaccountable efforts to engage in what had become, all to customary, Constitutional deprivations within the Easton Police Department.

107.   The likelihood is that, but for the alleged acts and omissions committed by the City, its decision and policy makers and supervisors, the injuries inflicted upon the Plaintiffs would not have occurred.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against Defendant Kinnel, jointly and severally with the City of Easton, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendant Kinnel in his individual capacity and, such other relief, including injunctive relief, which the Court may find appropriate.

<u>**COUNT IV**</u>
**42 U.S.C. § 1983**
**Failure to Intervene**
***Against Defendants, Celia and Does***

108.   The preceding paragraphs are incorporated herein by reference as though fully set forth.

109.   Each of the Defendants who was in the immediate area at the time, is liable for failing to intervene to prevent the assaults upon the Plaintiff and the Constitutional violations of Plaintiff's federally protected rights, at the hands of the other Defendants, most especially, Defendant Kinnel.

110.   Plaintiff's Constitutional rights were violated as alleged herein.

111. Under the aforestated circumstances, whether Defendants were or were not themselves violating Plaintiff's rights, they had the duty to intervene, including the duty to intervene to prevent the warrantless home invasion and the use of excessive force upon the Plaintiff by Defendant Kinnel and had a reasonable opportunity to do so.

112. Defendants had a realistic and reasonable opportunity to intervene.

113. Defendants failed to intervene. In fact, Defendant Sergeant Celia, directed Defendant Kinnel's unconstitutional actions, and was Defendant Kinnel's supervisor.

114. Accordingly, the Defendant Officers are liable for all the harm, and hence damages, suffered by the Plaintiff, as stated herein.

115. The likelihood is that, but for the alleged acts and omissions committed by Defendants, the injuries inflicted upon the Plaintiff by Defendant Kinnel would not have occurred.

116. Defendants are jointly and severally liable for their personal involvement in the commission of the acts complained of here, especially by virtue of their real-time acquiescence in their occurrence, and their intimidating presence.

117. Defendant, the City of Easton, is liable for the failure to intervene by Defendant Officers pursuant to the claims of Municipal and Supervisory

Liability, expressly set forth herein, and incorporated by reference as if set forth *et extenso* here.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against Defendant Celia and Does, and City, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities and, such other relief, including injunctive relief, which the Court may find appropriate.

<u>**COUNT V**</u>
**42 U.S.C. §1983**
**Denial Of Equal Rights Under The Law**
*Against All Individual Defendants and Does*

118. The preceding paragraphs are incorporated herein by reference as though fully set forth.

119. In the actions described above, the Defendants deprived the Plaintiff of rights protected by the Constitution of the United States of America, and the Defendants intended to deny the Plaintiff rights enjoyed by white citizens of the United States.

120. The supervisors, policy-makers and Defendant City were aware of the denial of equal rights under the law or were willfully blind, and have developed a practice, policy and custom of depriving non-whites equal

rights under the law, and either ignored or encouraged the Constitutional violations described above.

121.   The Plaintiff suffered harm due to the Defendants' violations of her Constitutional rights with the intent to deprive her of rights enjoyed by white citizens.

122.   42 U.S.C. § 1981 confers on all persons the right to "the full and equal benefit of all laws and proceedings for the security of persons and property …." 42 U.S.C. § 1981(a).

123.   Section 1981 provides extensive equal protection rights, but is properly brought here pursuant to Section 1983, which provides the remedy for violations of Section 1981 by state actors such as Defendant Officers.

124.   Due to its legislative history and emphasis on equal treatment under the law, Section 1981 is designed to provide a remedy whereas here, discrimination based upon race or alienage is presented as an element of the claim properly asserted under Section 1983 here.

125.   All the named Defendants but on are white and acted under color of state law, and with racial animus in their unlawful assault upon the Plaintiff, persons of Hispanic/Puerto Rican descent.

126.   Plaintiff was member of the protected Latino-Hispanic classes of persons, and Defendants, acting as agents of the government, under color of state

law, treated similarly situated individuals outside of the protected class differently, thereby evidencing purposeful discrimination against the Plaintiff.

127. Compelling evidence of this fact is the undeniable evidence that, even though there was identical noise-producing conduct engaged in by non-Puerto Rican residences of, and from, the 900 Block of Ferry Street, the Defendants pursued police action only against the Plaintiff's Hispanic family members and friends, intentionally and unconstitutionally assaulting the Plaintiff, a Puerto Rican who did not even speak English, who was clearly peaceable and law-abiding.

128. The racially charged statements made by the Defendants as they circled, en-mass, only her home occupied by Puerto Rican family members, also provides clean and constitutionally actionable conduct prohibited by Section 1981.

129. The City of Easton is liable for the actions of the Defendant Officers on the basis of the *Monell* assertions made hereinbefore and the fact that the Municipality's deliberate conduct was the moving force.

130. Likewise, the non-invading Defendants are liable for the actions of Defendants based upon the allegations of their supervisory and policymaking liability made hereinbefore, and the fact that this

Constitutional injury was recurrent to Easton residents who are members of Latino-Hispanic heritage and because the acts of their subordinates were caused by their deliberate indifference, knowledge and acquiescence, which may fairly be said to represent official municipal custom or policy.

131. The Defendant Officers are liable for their personal involvement in the commission of the acts complained of here.

132. Further, the conduct exhibited by Defendant subordinate municipal officers and employees, which occurred as stated herein, was not unexpected. Neither were they the deeds of independent, non-supervisory actors. But, rather, they constituted predictable behaviors of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, and their joint policies, practices and customs, which operated as the moving force behind what the Officers believed to be their unaccountable effort to engage in what had become, all to customary, Constitutional deprivations directed at a targeted member of the unprotected Latino-Hispanic communities.

133. Defendant City intentionally facilitated and concealed the unequal treatment of minorities by Defendants and other police officers, by failing to keep proper statistics and deleting from documents produced in discovery in other civil rights cases, and elsewhere, the race and ethnicity

of minority members of the community that have been the subject of use of force by members of the Easton Police Department.

134. The likelihood is that, but for the alleged acts, omissions committed by the other Defendants, and the acquiescence in the denial of equal rights under the law animated by same, the injuries inflicted upon the Plaintiffs would not have occurred.

135. As a direct and proximate result, the Plaintiff was injured and suffered damages as stated herein, as well as specific damages, provided for under 42 U.S.C. § 1981.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Easton District of Pennsylvania, together with punitive damages against Defendants in their individual capacities and, such other relief, including injunctive relief, which the Court may find appropriate.

<u>**COUNT VI**</u>
**42 U.S.C. § 1983**
**Civil Conspiracy**
***Against All Individual Defendants and Does***

136. The preceding paragraphs are incorporated herein by reference as though fully set forth.

137. The referenced Defendants participated in a conspiracy to violate the Plaintiff's Constitutional rights.

138. Direct evidence of conspiracy is rarely available and, therefore, the existence of a conspiracy must usually be inferred from the circumstances.

139. Those circumstances establishing a conspiracy here are very compelling:

   a. The Defendant Officers acted fully in concert – one with the other, obviously demonstrating the common plan, scheme or design that they agreed upon, when the home invasion occurred and assault upon the Plaintiff occurred;

   b. The Defendant Officers agreed thereafter to fabricate, and did fabricate, a continued story wherein they either falsely depicted the real occurrence giving rise to Plaintiff's injuries, or jointly provided a sanitized version of the assaultive and trespassory behaviors;

   c. The sole purpose of this fabrication was an attempt to excuse or otherwise justify and cover-up the warrantless home invasion and the unconstitutional assault upon the Plaintiff and her Constitutionally guaranteed civil rights;

   d. The Plaintiff was physically assaulted by Defendant Kinnel with the apparent acquiescence of others, including Defendant Sgt.

Ryan Celia, while he and other officers made racial comments and slurs intended to aggravate and agitate the crowd that was present;

e. All those Defendants reached an understanding that their actions would lead to the denial of the federally protected Constitutional Rights of the persons gathered, including the Plaintiff, and that understanding was reached before the home invasion and before the assault upon the Plaintiff which occurred contemporaneous with that invasion, and after;

f. The Defendants engaged in an after-the-fact conspiracy as evidenced by falsehoods appearing in contemporaneous police reports, and as material omissions, including specifically as to the infliction of injuries upon the Plaintiff and the absence of any reference to the excessive use of force that indisputably was inflicted upon her, including Defendant Kinnel's own failure to even mention in his report that he had discharged his Taser and struck the Plaintiff, causing her serious injuries nor, that he stood on her leg/ankle with such force that the Plaintiff thought it might be broken and, could not walk for months thereafter, which constitutes further evidence that the Defendants agreed to abide by

a sanitized version about what actually happened and, agreed to represent it falsely;

g.  Time was available for these Defendants to reach their agreement in both their gathering, discussing, and agitating which preceded the home invasion and assault and, in the period after the incident and before the finalization of their police reports;

h.  The after-the-fact conspiracy to cover up misconduct, including by unidentified Police Officer Defendants, constitutes a violation of Plaintiff's due process right of access to the courts under the Fourteenth Amendment; and

i.  The Defendants' false reporting (or non-reporting) was done in concert to avoid the detection of their unlawful and unconstitutional acts.

## COUNT VII
### 42 U.S.C. § 1983
### Failure To Prevent Actions Taken Under § 1985 - § 1986
### *Against All Individual Defendants and Does*

140.  The preceding paragraphs are incorporated herein by reference as though fully set forth.

141.  Defendants including John/Jane Does, acted as part of a conspiracy to interfere with Plaintiff's Civil Rights, violating 42 U.S.C. § 1985(3), which imposes civil liability on individuals who conspire to deprive "any person

… of the equal protection of the laws, or equal privileges and immunities under the laws."

142. In this regard, the Defendant Officers entered into a conspiracy, the elements of which are detailed herein.

143. The Defendant Officers were motivated by a racially based discriminatory animus in depriving Plaintiff, a person of Latino/Hispanic descent, of Constitutional rights, including their deprivation of the equal protection of the laws.

144. The Defendant Officers acted in furtherance of the conspiracy by allowing and then covering up their unlawful actions including the assault upon the Plaintiff, which occurred without justification, provocation or reason, in violation of Plaintiffs' Constitutional rights under the Fourth Amendment to the United States Constitution.

145. The Plaintiff has suffered harm as described herein from the Defendants' failure to prevent the conspiracy to violate her Constitutional rights, for which Plaintiff seeks damages under 42 U.S.C. § 1986.

146. Defendant Officers are liable for their personal involvement in the commission of the acts complained of here.

147. Defendants, the City of Easton, Mayor, Administrator and Chief, are liable for the acts of Defendant Officers pursuant to the claims of Municipal

Liability (*Monell*), and Policymaker and Supervisory Liability expressly set forth herein, and are incorporated by reference as if set forth *et extenso* here.

148. Further, the conduct exhibited by Defendant subordinate municipal officers and employees, which occurred on July 27, 2019, was not unexpected. Neither were they the deeds of independent, non-supervisory actors. But, rather, they constituted predictable behaviors of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, and their joint policies, practices and customs, which operated as the moving force behind what the Defendant Officers believed to be their unaccountable effort to engage in what had become, all to customary, Constitutional deprivations, directed at a targeted member of the unprotected Hispanic/Latino communities.

149. The likelihood is that, but for the alleged acts and omissions committed by the other Defendants, in their failure to prevent actions taken under 42 U.S.C. § 1985 - § 1986, the injuries inflicted upon the Plaintiff would not have occurred.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollars ($150,000.00) limit

for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities and, such other relief, including injunctive relief, which the Court may find appropriate.

**COUNT VIII**
**42 U.S.C. §1983**
**Conspiracy To Interfere With Civil Rights**
***Against All Individual Defendants and Does***

150.   The preceding paragraphs are incorporated herein by reference as though fully set forth.

151.   As described above, the Defendants conspired to deny the Plaintiff the rights afforded non-Hispanic, white citizens, by the acts described herein and by assaulting Plaintiff, and then conspiring to conceal what actually occurred.

152.   This conspiracy was engaged in with the intent to deprive the Plaintiff of her Constitutional rights and equal protection of the law.

153.   The Plaintiff suffered harm due to the Defendants' conspiracy to violate her Constitutional rights with the intent to deprive her of the equal protection of the law.

154.   As a direct and proximate result, the Plaintiff was injured and suffered damages as stated herein and further seek damages under 42 U.S.C. § 1985.

155.   Specifically, the agreement to deprive the Plaintiff of her rights was motivated by racially discriminatory animus on the parts of Defendants

and reflected the custom and culture established within the Easton Police Department for its officers to engage in Constitutional deprivations directed at targeted members of the Latino/Hispanic communities, of which Plaintiff was members.

156. Motives, much less motives that have racially discriminatory animus as their source, are not frequently broadcast at the moment they are acted upon – "racial animus is often difficult to prove because it relies on hidden and unconscious biases" – it is for this reason that such animus is generally identified by circumstantial evidence that the discriminatory offenders acted in accordance with such animus before or after the discriminatory behavior at issue, not only at the very moment of the challenged conduct.

157. Based upon information and belief, Plaintiff believes and therefore avers that a reasonable fact-finder, considering all the material facts, would reasonably conclude that the Defendants' selected the course of action which they followed here because of the Plaintiff's race, and that such a conclusion would logically result from consideration of, *inter alia*, the following factors:

1. The racial composition of the parties, with the Plaintiff being non-Caucasian and the Defendant Kinnel being Caucasian, together with all but one other Easton police officers present at the time;

2. Defendants have previously had assaultive and verbal exchanges with Latino/Hispanic citizens in Easton wherein they expressed animus towards individuals because of their race including specifically Plaintiff's son;

3. The Defendants, based upon information and belief, have engaged in prior acts of physical abuse against those of Plaintiff's heritage in disproportionate numbers when compared to those of non-Latino/Hispanic heritage;

4. Defendants have a history of referring to persons of Latino/Hispanic heritage in racially derogatory and discriminatory terms in casual conversation with others;

5. The Defendants' conduct cannot be viewed in isolation, but must be considered as part of a sworn force whose racially discriminatory history against Latinos/Hispanics is well-documented and supported by statistically significant evidence, which mirrors the racial animus of the Defendants; and

6. The racially charged epithets yelled at the Hispanic gathering of when the Plaintiff was apart are undeniable racist remarks and show racial animus.

158.   The above factors, individually, would permit a reasonable jury to believe that the unlawful and unconstitutional acts committed by Defendants were motivated by racially discriminatory animus, which were carried on as part of a preconceived scheme or common understanding to deprive the Plaintiff, directly or indirectly, of the equal protection of the law.  However, when combined, these factors conclusively lead to the conclusion that such was the case.

159.   Defendant Officers are liable for their personal involvement in the commission of the acts complained of here.

160.   Defendants, the City of Easton, Mayor, Administrator, and Chief, are liable for the acts of the Defendant Officers pursuant to the claims of Municipal Liability (*Monell*), and Policymaker and Supervisory Liability expressly set forth herein, and are incorporated by reference as if set forth *et extenso* here.

161.   Further, the conduct exhibited by subordinate municipal officers and employees, which occurred on July 27, 2019, was not unexpected.  Neither were they the deeds of independent, non-supervisory actors.  But, rather, they constituted predictable behaviors of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, and their joint policies, practices and customs, which

operated as the moving force behind what the Officers believed to be their unaccountable effort to engage in what had become, all to customary, Constitutional deprivations directed at a targeted member of the unprotected Latino/Hispanic communities.

162. The likelihood is that, but for the alleged acts and omissions committed by the other Defendants, the injuries inflicted upon the Plaintiff would not have occurred.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania.

**COUNT IX**
**42 U.S.C. §1983**
**Supervisory Liability**
***Against Defendants Scalzo, Panto, Campos and Does***

163. The preceding paragraphs are incorporated herein by reference as though fully set forth.

164. The preceding paragraphs are incorporated herein by reference as though fully set forth.

165. At all times pertinent to the claims made herein, Mayor Panto, Chief Scalzo, Administrator Campos and John/Jane Does 1-X occupied both policymaking and supervisory positions relative to the City of Easton's

Police Department and the subordinate members of its force, concerning which all other individual Defendants were officers, members and employees.

166. Generally speaking, Mayor Panto retained ultimate responsibility over the operations of the Police Department as the executive of Easton, a City of the Third Class operating under an Optional Plan B form of government wherein Mayor Panto shared both supervisory and policymaking responsibilities with Chief Scalzo when it came to Easton's Police Department which the Chief headed, as did Administrator Campos.

167. In practice, Mayor Panto retains ultimate responsibility to supervise and monitor the overall operation of the Police Department, Chief Scalzo was responsible to supervise and monitor the day-to-day operations of the Department; and Administrator Campos also had responsibility for the supervision of the Easton Police Department. Each had final decision-making authority with regard to the operational conduct of the subordinate members of the police force; each retained the authority to measure the conduct and decisions of police subordinates; each played a role in fashioning and implementing Departmental police policies, practices, procedures and customs, and often did so in consultation with one another.

Each is a person whose actions may fairly be said to represent official municipal policy or custom.

168. Defendants Panto, Scalzo, and Campos implemented several policies and practices that created an unreasonable risk of Constitutional violations on the part of their subordinates, including specifically, the individual Defendants here; and, their failure to change those policies or employ corrective practices is a direct cause of the unconstitutional conduct, which was inflicted upon the Plaintiff.

169. Most specifically among these practices was for Panto, Scalzo, and Campos to ignore the pattern and history of Constitutional abuses committed by the police officers under their supervision.

170. The existing custom and practice followed by Defendants Panto, Scalzo, and Campos was, *inter alia*, largely to ignore Constitutionally implicated complaints about the conduct of their officers; to fail to properly investigate them; to fail to take corrective and disciplinary action, to allow for the cover-up of police misconduct; to adopt policies which are designed to protect officers and the City from civil liability rather than to protect the citizenry from their unlawful acts; to stifle citizens' complaints; to conceal or otherwise make it extremely difficult to recover information which should be immediately available for policy maker and supervisory review

and action; to settle cases requiring the gaging of victims of police misconduct and their counsel so as to deceive the public and prohibit them from knowing the dangerous nature of police officers which the City employs; and to settle cases requiring the dismissal of liable police officers in exchange for placing the liability amorphously upon the City and requiring language admitting no liability.

171.  This deliberate indifference to the violations of their Constitutionally protected rights, not only reinforced the justifiable belief among the citizenry that it was useless to register complaints about police misconduct and abuse, but, it created further ill-will, and even more significantly, sent a message to the members of the police force that their violations of the community's Constitutional rights would be tolerated and go unpunished, thereby encouraging further and even more serious violations, and an unreasonable risk of just the sort of harms that were visited upon Plaintiff as described herein.

172.  The institutionalization of a culture of constitutionally abusive police misconduct within the Easton Police Department which took a permissive approach to instances of *inter alia*: unlawful trespass; unlawful arrests; excessive use of force; and the filing of false police Complaints, Affidavits and reports, was so obvious as to be apparent to any reasonable supervisor

or policymaker, including Defendants Panto, Scalzo; and Campos and, their indifference to the risks that these customs, practices, and supervisory procedures presented, were the moving force which resulted in the Constitutional violations suffered by the Plaintiff.

173. This was no more true than with the Defendants' deliberate indifference to the need to provide its officers, including most especially, the Defendants here, with more or better training with regard to the safeguards afforded by the Fourth and Fourteenth Amendments, including particularly the prohibitions regarding search and seizure and the use of excessive force and violations of due process.

174. Defendants Panto, Scalzo, and Campos were aware that their officers routinely confront situations that may require the use of force, including deadly force, that such situations often involve difficult decisions on the part of officers about how much force to use or whether to use force at all, and that excessive force liability will frequently result if officers use more force than is reasonably necessary under the circumstances.

175. Defendant's Panto, Scalzo, and Campos were aware of the numerous incidents of the excessive use of force that had been committed by members of the Department in the past, including those involving the Defendants *sub judice*, and failed to subject them and other offenders to

appropriate evaluation, discipline and remedial training, thereby demonstrating a tolerance of past and/or ongoing police misbehavior, through knowledge and acquiescence in their subordinates' Constitutional violations.

176. Moreover, the conduct exhibited by Defendants on July 27, 2019, was not that of unexpected, independent, non-policymaking actors, but constituted deliberate and predictable acts of subordinates who operated with a rightly perceived impunity due to the ongoing deliberate indifference of their supervisors and policymakers, Defendants Panto, Scalzo, and Campos and their well-established practices, policies and customs which operated as the moving force behind what the officers thought would be an overlooked and tolerated effort to engage in what had become customary Constitutional deprivations.

177. The lacking supervisory practices or procedures (or policies), which Defendants Panto, Scalzo, and Campos were required at a minimum to promulgate, implement, monitor and, if necessary, modify, include, *inter alia*, the following: a heightened supervisory sensitivity and vigilance for uncovering and eradicating Constitutional violations; procedures whereby members of the public who have experienced Constitutional police violations are encouraged to access a simple, convenient, non-retaliatory,

and responsive procedure to register their complaints and receive prompt, objective responses; procedures carefully cataloging complaints (legal, formal and informal) and their respective outcomes – by name, nature of claim, and resolution and corrective action if any; procedures for the efficient, effective, objective investigations of all claims and complaints, for their analysis, and requiring the prompt and open imposition of disciplinary, corrective action or policy or procedural change; procedures for promptly responding to those who registered complaints and for securing feedback concerning the resolution reached (necessary to restore good community relations and to encourage the belief that their complaints will not be ignored); procedures requiring remedial training in Fourth Amendment safeguards including the use of force limitations; procedures requiring training and remedial retraining in the Fourteenth Amendment safeguards and, especially the essential need for accurate, objective and comprehensive Complaint, report and Affidavit writing; practices and procedures for officer conduct which places the focus of the truth-seeking process and on eliminating police misconduct rather than protecting it from prosecution, punishment or discipline; procedures for the complete statistical analysis of police complaints from whatever source, I.A. outcomes, use of force incidents, the race of use of force victims, criminal

charges filed, prosecutions pursued and criminal convictions secured, etc.; procedures which permit the prompt identification and retrieval of all complaints, outcomes, and evidence, (including videos) on an individual officer basis; etc.

178. The existing customs within the Easton Police Department created an unreasonable risk of injury to citizens such as Plaintiff, in the absence of the above-specified supervisory practices.

179. Defendants Panto, Scalzo, and Campos were aware that the risks existed because they were obvious and because they had previously resulted in constitutional claims and violations by officers under their supervision.

180. Defendants Panto, Scalzo, and Campos were indifferent to these risks, given their failure to punish or otherwise remediate past conduct which resulted in adverse consequences from those risks, and their failure to modify departmental practices, policies, General Orders, and procedures which have been brought to their attention as being seriously deficient, if not unconstitutional on their face.

181. The underlying Constitutional violations inflicted on the Plaintiff resulted from Defendants Panto, Scalzo, and Campos' failure to employ the above, and other, supervisory practices, or policies, and failing to train, instruct, and monitor the line supervisors below them in the chain of command.

182.   As a result of the deficient supervision and policymaking of the Defendants,

Plaintiff suffered the damages alleged herein.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against Defendants Pawlowski and Morris and John/Jane Doe supervisors, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities and, such other relief, including injunctive relief, which the Court may find appropriate.

### COUNT X
### 42 U.S.C. § 1983
### Municipal Liability
### *Against City of Easton*

183.   The preceding paragraphs, especially those which set forth, in and of themselves, facts upon which *Monell* liability against the City of Easton will safely reside, are incorporated herein by reference as though fully set forth.

184.   The Easton Police Department has a long history of mishandling crowds, especially those consisting of people with mixed intentions.

185.   At least as far back as <u>Ricker v. Weston and the City of Easton, et. al.,</u> where, six (6) Easton Police Officers charged and injured a crowd of loud Phillipsburg high school football fans taking their traditional walk over the

54

Phillipsburg – Delaware River Bridge following their victory over Easton High School's football team, the City of Easton and its police department have failed to train and instruct their officers on how to handle noisy crowds without violating individual's civil rights in the process, and without allowing the malevolent intentions of only a few police officers dictate the conduct of the other officers present.

186. In <u>Ricker,</u> the jury awarded a verdict in excess of One Million Dollars against the City of Easton and its defendant officers, including hundreds of thousands of dollars in punitive damages against the officers for conduct which the jury found to be so outrageous as to be inacceptable in a civilized society, conduct which was again observed here. In fact, the City there secretly gave heroism awards to the very officers who the jury found to have committed outrageous, willful and wanton assaults upon innocent men, women, and children.

187. From that time until the present, the City and its officers have paid out judgments and/or settlements for violations of civil rights in excess of Six Million Dollars and, the City and its officers were subject to both civil and criminal investigations which concluded, *inter alia*, that not only were its officers' handling of crowds historically deficient due to lack of training, lack of policies, lack of enforcement and supervision but, that the City and

its Police Department also <u>failed to:</u> adopt and enforce appropriate policies to properly deal with "susceptible [minority and poorer] populations [and] to protect those most vulnerable citizens and to provide parole officers with clear guidance that could prevent needless injuries or death; adopt and enforce policies, and to train officers in the need to attempt to verbally de-escalate situations before employing force; provide effective taser training and to require effective taser warnings prior to use; conduct proper investigations of its officers alleged misconduct, instead of untimely disorganized so-called "investigations" which lacked basic protocols; have officers consistently follow the policies which did exist; provide necessary training to enforce policies and procedures regarding officer compliance in such areas as the proper use of force; require the proper, consistent and accurate preparation of use of force incident reports; require Use of Force reports which needed more detail, better consistency among officers' reports and better supervisory review; and failed to provide proper training, policies and procedures and supervision of the Use of Tasers by its officers.

188.   As an express condition of one multi-Million Dollars civil rights police abuse case settlement with the City, the City was required to have the operation of its Police Department and the way the policy-makers ran it, reviewed by the Pennsylvania's Chiefs of Police Association and Keystone

Municipal Services. Both organizations issued reports received by the City of Easton in June of 2015, which were highly critical of the structure and command of the police department which, continued to operate as the prime mover in the instant incident.

189. Thereafter, a statewide investigating grand jury (#22) was empaneled to investigate the death of one Easton Police Officer by another and its report, issued on, March 15, 2006, addressed not only the officer's death, but also the command, culture and training of the EPD and found each aspect significantly deficient in ways that continued and, in fact, were the, same moving force behind the instant unconstitutional assault upon this Plaintiff and her home; and, had they been corrected, the instant incident would not likely have occurred.

190. As this and other intervening civil rights lawsuits clearly demonstrate, those recommendations were not taken seriously by the City and its Policymakers or Supervisors.

191. The above findings of serious deficiencies in the City's operation of its police department were also included in those made by the United States Department of Justice which opened a rare criminal investigation into the City of Easton's pattern of police brutality in October of 2005, conducted

pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141.

192.   Rather than being criminally prosecuted, the City entered into an agreement with the Justice Department to make substantial changes in the policies, practices, supervision, structure, culture, training and discipline of its police department and officers.

193.   Because of a failure to substanstially comply with the requirements of the agreement, it was extended from merely a one year agreement until it was finally closed on July 31, 2015, when it was closed, nearly ten (10) years later.

194.   From that time until the present, the City and its police department and officers have reverted to its pre-agreement culture and conduct of Constitutional abuses as evidenced by the conduct giving rise to the instant cause of action, and others.

195.   In fact, a little over one month ago, the City of Easton settled a lawsuit brought against it by one of its own (and few) minority police officers, George E. Lockett, Jr., who asserted in a federal civil rights lawsuit that he suffered retaliation for reporting to superiors racist conduct that was systemic within the Easton Police Department and which reached up to and including its command structure.

196.  The City, through Defendant Luis Campos, publicly denied Lockett's claim, but confidentially paid him a settlement conditioned upon an agreement that he not further discuss what he knew about racism having become a matter of an extensive culture within the Easton Police Department.

197.  Prior to July 27, 2019, the Defendant City of Easton continued its long history of Constitutional violations of the rights of it's citizens by either failing to develop policies or, developing and maintaining policies and/or customs exhibiting deliberate indifference to the Constitutional rights of persons in Easton, without which the aforesaid violations of Plaintiff's Constitutional rights would likely not have occured.

198.  The violations of Plaintiff's Constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, Plaintiff's damages, and the conduct of the individual Defendants were directly and proximately caused by the actions and/or inactions of Defendant City of Easton, by and through its decision-makers, which has encouraged, tolerated, ratified, and has been deliberately indifferent to, *inter alia*, the following policies, patterns, practices, and customs, and to the need for more or different training, supervision, investigation, or discipline in the areas of:

a.  The use of force by police officers;

b.  The proper exercise of police powers, including, but not limited to the making of an arrest, proper search and seizure, and the use of force;

c.  The monitoring of officers whom it knew or should have known were suffering from emotional, psychological, and/or drug dependent problems that impaired their ability to function as officers;

d.  The failure to identify and take remedial or disciplinary action against police officers who were the subject of prior civilian or internal complaints of misconduct;

e.  Police officers' use of their status as police officers to employ the unreasonable use of force  especially out of racial or other personal animus, or to achieve ends not reasonably related to their police duties;

f.  The failure of police officers to follow established policies, procedures, directive, and instructions regarding the warrantless entry of homes, seizures and/or arrests and the use of force under such circumstances as presented by this case;

g.  The failure to properly sanction or discipline officers who are aware of and conceal, and/or aid and abet, violations of Constitutional rights of citizens by other Easton police officers; and

h.  The practice among Easton police officers of subjecting citizens to unlawful force, with the intention of precluding such individuals from instituting civil claims by falsifying the events which occurred, in official reports and by conducting sham investigations.

199.  It was also the policy and/or custom of the Defendant City of Easton to inadequately and improperly investigate citizen complaints of police misconduct, and acts of misconduct were instead tolerated and/or justified by the City of Easton, including, but not limited to, complaints of citizens, especially minority citizens, or even those of its own officers

200.  It was also the policy and/or custom of the Defendant City of Easton to inadequately screen during the hiring process (including psychological and drug screening) and to fail to intermittently test thereafter, and to inadequately train and supervise its police officers, including Defendant police officers, thereby failing to adequately discourage further Constitutional violations on the part of its police force in general, and Defendant Officers in particular.

201.  The Defendant City of Easton did not require or demand appropriate in-service training or re-training of officers who were known to have engaged in police misconduct or who were known to encourage or tolerate same.

202.  In fact, no officer of any rank, in any department of the EPD, ever came to a training director and recommended any changes in the officer training to prevent the excessive use of force, eventhough excessive force claims were numerous and, eventhough the City of Easton was required to pay out over millions of dollars in excessive force claims in the recent past.

203.  The Defendant City of Easton also did not adopt needed policies, which should have been intended and calculated to avoid the Constitutional violations referred to herein, including specifically those that follow.

204.  The lacking practices or procedures (or policies), which Defendant City of Easton was required, at a minimum, to promulgate, implement, monitor and, if necessary, modify, include, *inter alia*, the following: a heightened supervisory sensitivity and vigilance for uncovering and eradicating unconstitutional violations, especially those that are driven by overly aggressive officers; procedures whereby members of the public who have experienced Constitutional police violations are encouraged to access a simple, convenient, non-retaliatory, and responsive procedure to register their complaints and receive prompt, objective responses; procedures

carefully cataloging complaints (legal, formal and informal) and use of force, and their respective outcomes, publicly if necessary, – by name, nature of claim, evidence available and resolution, including corrective action, if any; procedures for the efficient, effective, objective investigations of all claims and complaints, their analysis and requiring the prompt and open imposition of disciplinary, corrective action, remedial training, or policy or procedural change; procedures for promptly responding to those who registered complaints, or who self-reported, and for securing citizen feedback concerning the resolution reached (necessary to restore good community relations and to encourage the belief that their complaints will not be ignored); procedures for racial/cultural sensitivity training; procedures for the active pursuit and enlistment of minority heritages, including Puerto Rican, and with multi-lingual abilities; procedures requiring remedial training in Fourth and Fourteenth Amendment safeguards including citizen's Constitutional rights to be free from unlawful search and/or seizure, and the use of force limitations; procedures requiring training and remedial retraining in the Fourteenth Amendment safeguards and, especially the essential need for accurate, objective and comprehensive Complaint, report and Affidavit writing; practices and procedures for officer conduct which places the focus of the

truth-seeking process and on eliminating police misconduct rather than protecting it from prosecution, punishment or discipline; procedures for immediately identifying circumstances and the identity of officers who are excessive force prone and/or who file fabricated or incomplete reports; procedures for conducting both internal and external objective reviews of all claims of unconstitutional or otherwise unlawful police conduct; procedures for identifying officers who are in need of remedial training; procedures for testing the validity and efficiency of I.A. and O.P.S. operations; and procedures for effectively and independently, monitoring officers' drug (including steroid) or alcohol abuse (such as random testing) and for monitoring and testing officer's mental health (including anger management issues) and racial bias; racial sensitivity trainings; de escalation training; crowd interaction training; competency based training and testing; competency based training, and testing regarding psychomotor skills, especially when it comes to electronic control weapons (ECWs, Tasers, etc.)

205.   The existing customs within the Easton Police Department created an unreasonable risk of injury in the absence of the above-specified supervisory practices and procedures.

206.  The City of Easton policy makers were aware that these risks existed because they were obvious and because these risks had resulted in Constitutional harms, which had occurred previously under their supervision.

207.  The City of Easton policy makers were indifferent to these risks, given their failure to eliminate or remediate those responsible for the past unconstitutional consequences of said risks, and their failure to modify departmental practices, policies, General Orders, and procedures which have been brought to their attention as being seriously deficient, if not unconstitutional on their face.

208.  It was the policy and/or custom of the Defendant City of Easton to allow and even promote the excessive use of force by its officers, as well as the commission of the other Constitutional violations described herein, including the cover-up of such acts and/or omissions.

209.  In spite of numerous and various excessive force complaints made against the EPD relating to arrests, physical contact with citizens, and the use of manual devices which deploy force, such as the Taser, the City and EPD have never proposed any changes to the EPD's Use of Force Policy to curb excessive use of force, eventhough the City of Easton was required to pay millions of dollars in excessive force claims in the recent past.

210.   Although an expert in police use of force advised the City and EPD at least as early as 2013 that the City had in place a defective and unlawful use of force policy and practice that grants unfettered discretion to officers to use force and which expressly permits the use of force on non-assailants, on resistors, and on individuals who have not actually assaulted police officers but merely defended themselves against excessive force, the City and EPD never changed its use of force policy to protect its citizens from police abuse.

211.   Other experts have similarly advised the City and EPD of its unlawful force policy, and its defective policy relating to, but have ignored these experts and brought no change, either in policy directives or in actual enforcement, to remedy its unlawful policies and practices.

212.   As a result of the above described policies and customs and failure to enforce and/or adopt necessary and appropriate policies, police officers of the Defendant City of Easton, including the Defendants, believed that their actions would not be properly monitored by supervisory officers or the City and reasonably believed that their misconduct would not be investigated or sanctioned, but would be tolerated and even encouraged.

213.   As stated hereinbefore, the promulgation of general orders, policies, or practices which are directed at creating potential defenses for officers'

unconstitutional acts, including the assaultive and conspiratorial acts alleged herein, rather than general orders, policies or practices which are directed at identifying, punishing and eliminating those unconstitutional acts, and which ignore the Constitutional protections guaranteed to all citizens, constitutes irrefutable evidence of the City, its supervisors and decision-makers, deliberate indifference to those rights.

214. The above described deficient policies and customs, and the failure to enforce, modify, terminate and/or adopt and enforce necessary and appropriate policies, practices, procedures, and General Orders, demonstrates a deliberate indifference on the part of the policymakers of the Defendant City of Easton, and has continued to serve as the moving force behind, and the cause of, the violations of the Plaintiff's rights as alleged herein, as well as the claimed damages which resulted therefrom.

215. But for this deliberate indifference, the injuries, which were suffered by the Plaintiff, would, in all likelihood, not have occurred.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the Defendant City of Easton, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania and, such other relief, including injunctive relief, which the Court may find appropriate.

### COUNT XI
**State Assault and Battery**
***Against Defendant Kinnel***

216. The preceding paragraphs are incorporated herein by reference as though fully set forth.

217. Defendant Kinnel intentionally assaulted and battered Plaintiff as stated hereinbefore.

218. As a result of Defendant's assault and battery, Plaintiff suffered the damages stated herein.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against Defendants Officers, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities and, such other relief, including injunctive relief, which the Court may find appropriate.

### COUNT XII
**State Action - Trespass**
***Against Defendant Kinnel and Does***

219. The preceding paragraphs are incorporated herein by reference as though fully set forth.

220.   On July 27, 2019, as more fully described hereinbefore, Defendant Kinnel, and Does, intentionally entered into the property of Plaintiff located at 934 Ferry Street, Easton, PA 18042.

221.   They did so not only intentionally, without a warrant and without privilege to do so but, they forcefully entered without the consent of the Plaintiff, thereby violating the Plaintiff's right to peaceably enjoy full use of her property and causing her substantial and continuing emotional distress.

222.   The entrees made were unlawful, intentional, forceful, willful, wanton, and made in reckless disregard for the rights of the Plaintiff, entitling her to punitive damages in addition to compensatory damages.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendant Officers, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities, and such other like below wherefore

<u>**COUNT XIII**</u>
**State Civil Conspiracy**
***Against All Individual Defendants and Does***

223.   The preceding paragraphs are incorporated herein by reference as though fully set forth.

224.  The referenced Defendants conspired to engage in the tortious State claims alleged herein, whereby each Defendant acted in concert, pursuant to an agreement, to cause the stated harms or in some way facilitated the conspiratorial objective of inflicting the resulting harms, upon the Plaintiff, by their own acts or omissions or by those of fellow co-conspirators.

225.  As a result of the aforesaid conspiracy engaged in by Defendants, Plaintiff suffered the damages stated herein.

226.  The conspiracy entered into was intentional, deliberate, willful, wanton and engaged in with a reckless disregard for the well-established Constitutional rights of the Plaintiff warranting punitive as well as compensatory damages.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against each Defendant, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities and, such other relief, including injunctive relief, which the Court may find appropriate.

## COUNT XIV
### State Constitutional Violations
### *Against All Individual Defendants and Does*

227.   The preceding paragraphs are incorporated herein by reference as though fully set forth.

228.   The conduct of the Defendants, as alleged herein, was violative of the Plaintiff's rights under Article I, Section 1, Article I, Section 8 and Article I, Section 9 of the Constitution of the Commonwealth of Pennsylvania.

229.   As a result of the Defendants' conduct, which was violative of the guarantees afforded Plaintiff under the Pennsylvania Constitution, Plaintiff suffered the damages stated herein.

230.   To the extent that the Supreme Court of Pennsylvania may still not have ruled on the precise issue of whether these sections of the Pennsylvania Constitution provide a private cause of action for monetary damages to its citizens, Plaintiff nonetheless asserts her well-recognized right to injunctive relief – prohibiting the Defendants from their continued engagement in the acts complained of herein.

231.   Plaintiff believes and therefore alleges that she is at continuing risk to suffering the identical harms by these Defendants in the event that court intervention does not occur and/or an appropriate permanent injunction is not entered.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendant Officers, jointly and severally, and in the form of equitable relief.

## OTHER

232.   Plaintiff respectfully requests a jury to deliberate upon the within causes of action.

233.   The within case is not subject to arbitration.

234.   Where permitted, the Plaintiff demands reasonable legal fees, costs, interest, expenses, delay damages, compensatory damages, punitive damages and any other damages deemed appropriate by the Court.

235.   Plaintiff requests that this Honorable Court issue declaratory and injunctive relief, as appropriate, declaring the within described practices to be unlawful, and enjoining their present and continued employment and effects.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court for each Count alleged:

a.   Award compensatory damages to Plaintiff against each Defendant, jointly and severally, in an amount in excess of $150,000.00 exclusive of interest and costs in each of the foregoing Counts;

b.  Award punitive damages to Plaintiff against each of the individual Defendants, in their individual capacities, jointly and severally, in an amount in excess of $150,000.00 exclusive of interest and costs in each of the foregoing Counts;

c.  Award reasonable attorney's fees and costs to the Plaintiff, as may be awardable pursuant to 42 U.S.C. Section 1988, the Civil Rights Attorney's Fees Award Act of 1976, or any other appropriate statutory provisions;

d.  Enter an Order enjoining Defendants from engaging in the future in the conduct identified in the Complaint as violative of 42 U.S.C. §§ 1983,1985, 1986 and 1988, the 4th and 14th Amendments of the Constitution of the United States, and Article I, Section 1, Article I, Section 8, and Article I, Section 9 of the Pennsylvania Constitution; and further affirmatively requiring the Defendant City of Easton to engage in appropriate remedial efforts to adopt, and enforce, policies for the Easton Police Department that are calculated and intended to preclude the conduct alleged to have been engaged in by the Defendants named herein and providing for the independent monitoring of same more extensive than that previously conducted by the United States Department of Justice; and

e. Award such other and further relief, as this Court may deem appropriate.

Respectfully Submitted:

Dated: July 27, 2021

By: _____
Robert E. Goldman, Esquire
PA Attorney I.D. # 25340
535 Hamilton Street, Suite 302
Allentown, PA 18101
(610) 841-3876
reg@bobgoldmanlaw.com
Attorney for Plaintiff